Edward I. FARLEY and George B. Young, as Executors of the Will of Marshall Field, Deceased,

v.

The UNITED STATES.

No. 423–72.

United States Court of Claims.

July 14, 1978.

James B. Lewis, New York City, atty. of record, for plaintiffs; Ronald W. Meister and Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before DAVIS, NICHOLS and KASHIWA, Judges.

## OPINION

### PER CURIAM:

This case comes before the court, without oral argument, on plaintiffs' motion, filed April 19, 1978, requesting that the court adopt the recommended decision of Trial Judge Philip R. Miller, filed February 17, 1978, pursuant to Rule 134(h), as the basis for its judgment in this case, defendant having filed no intention to except thereto and the time for so filing pursuant to the Rules of the court having expired. The court agrees with the trial judge's ultimate conclusion, and sets forth hereinafter his entire opinion. However, in view of the disposition of the case, the court finds it necessary to consider only the two issues discussed in the second half of the opinion, *i. e.* whether under Illinois law the widow here had enforceable rights in the decedent's estate which were recognized by the settlement, and whether the settlement was motivated by considerations other than recognition of the widow's rights under Illinois law. On those issues the court agrees with the trial judge's opinion and adopts that portion of the opinion as the basis for its judgment in this case. In view of that disposition, it is unnecessary to pass upon the broader and more general issue discussed in the first half of the opinion and the court neither adopts nor rejects the trial judge's opinion on that question, but sets it forth as the trial judge's views. It is concluded, therefore, that plaintiffs are entitled to recover overpaid taxes and interest and judgment is entered for plaintiffs accordingly, with the amount thereof to be determined in further proceedings pursuant to Rule 131(c).*

## OPINION OF TRIAL JUDGE

### MILLER, Trial Judge:

This is a suit for refund of federal estate tax. Plaintiffs are the executors of the Estate of Marshall Field IV, who died on September 18, 1965. The question presented is whether or not the sum of $500,000 paid by the decedent's estate to his widow in settlement of a dispute over the proper method of computation of her statutory share of the estate in lieu of dower qualifies for the estate tax marital deduction under section 2056 of the Internal Revenue Code.[1]

---

\* Whereas the court adopts the trial judge's separate findings of fact, which are set forth in his report filed February 17, 1978, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. All reference to the Internal Revenue Code refer to the 1954 Code (26 U.S.C.).

At the time of his death, Mr. Field was married to Lynne Templeton Field, his third wife. He was 50 years of age; she was in her early or mid-twenties. They had been married only slightly over 1 year, and they were contemplating divorce. Mr. Field was also survived by six children, two by his first marriage, three by his second, and one by his third.

Decedent's will made no bequest or devise to his wife, although it did make provision for their infant child, Corinne. After several specific bequests, the residue of Mr. Field's estate, which represented the bulk thereof, was divided into six equal portions, one to be distributed to a trust for each of his six children.

The widow renounced decedent's will and claimed her renunciative share pursuant to the Illinois Probate Act (Ill.Ann.Stat. ch. 3, § 16 (Smith-Hurd 1961)), which provides:

> When a will is renounced by the testator's surviving spouse * * *, whether or not the will contains any provision for the benefit of the surviving spouse, the surviving spouse is entitled to the following share of the testator's estate *after payment of all just claims:* one-third of the personal estate and one-third of each parcel of real estate if the testator leaves a descendant * * * [Emphasis supplied.]

A dispute arose between Mrs. Field and the executors as to the proper method of arriving at her one-third share. The executors reduced the decedent's gross estate by the amount of the federal estate tax and then assigned to her one-third of the remainder. Mrs. Field calculated her share as one-third of the estate prior to any reduction for federal estate tax. The difference between the two calculations is almost $4 million.

The executors' principal support for their position was the underlined portion of the Illinois statute and the decision of an Illinois intermediate appellate court in *Northern Trust Co. v. Wilson*, 344 Ill.App. 508, 101 N.E.2d 604 (1st Dist. 1951), *leave to appeal denied,* 410 Ill. 630 (1952). However, Mrs. Field's attorney, Brainerd Chapman,

argued that since, because of the marital deduction, her share was not subject to federal estate tax, it should not bear any part of the burden of that tax. He contended that the *Wilson* case was distinguishable because Mr. Field's will, unlike Wilson's, contained a provision that taxes were to be paid out of the residue of the estate; and, therefore, the renunciative share not being a portion of the residue the decedent did not intend that such share should bear the tax burden. Mr. Chapman expressed the opinion that the *Wilson* decision could be overruled because: the issue had not been passed upon by the Supreme Court of Illinois; *Wilson* had been decided shortly after enactment of the federal estate tax marital deduction where there was yet little authority on the issue; and most of the appellate decisions in other states were in accord with the widow's position.

The dispute not having been resolved, in March 1968 Mrs. Field instituted an action in the Chancery Division of the Circuit Court of Cook County, Illinois (the Chancery Court), against the executors, the trustees of the residuary trusts and the six children who were beneficiaries to the trusts. The petition demanded a declaratory judgment that the widow was entitled to receive one-third of the decedent's estate before reducing the value of the estate by its obligation for federal estate taxes, an accounting for the property of the estate, a mandatory injunction, and other relief. In this action, Mr. Chapman associated with his firm one of the leading litigating law firms in Chicago, for the purpose of pursuing the matter to the Illinois Supreme Court if necessary. Such action, entitled *Field v. Farley,* was in litigation for 21 months, during which time it was contested in a fully adversary manner, with a great deal of work being done by both sides. On April 9, 1969, the Chancery Court granted the estate's motion to dismiss on the merits, relying on the authority of the *Wilson* case and on the absence of any intent by the decedent in his will to have his children bear the entire burden of the estate tax in favor of his widow, for whom he had made

no provision at all. However, on May 8, 1969, Chancery Court granted leave to Mrs. Field to file a motion to vacate or to modify its ruling.

During the course of this litigation, a variety of views were expressed by the executors and their attorneys as to Mrs. Field's likelihood of success. David T. Washburn, a member of a New York law firm counseling the executors, advised that there was a substantial chance that Mrs. Field might prevail. Howard A. Seitz, a member of the same law firm, advised the executors that in the light of the *Wilson* decision Mrs. Field was unlikely to prevail, and that her suit was a nuisance case. The executors' Illinois counsel advised them that Mrs. Field had a better chance than Mr. Seitz believed although still not a very good chance. On the basis of such advice and his own independent evaluation as an attorney, executor George B. Young concluded that there was about one chance in three that the executors might lose the case. Mr. Edward I. Farley, the other executor, did not precisely calculate the possibilities of success but concluded that Mrs. Field's chance of overturning the *Wilson* case had to be reckoned with.

During the pendency of *Field v. Farley,* the executors and their attorneys held settlement discussions with Mr. Chapman, Mrs. Field's attorney. The settlement negotiations between the parties were conducted at arm's length. The executors were also trustees of the testamentary trust for the decedent's six children, only one of which was Mrs. Field's child, and they engaged in hard bargaining in order to retain as many as possible of the assets in the estate for the trusts rather than to have them go to Mrs. Field. There was also a considerable hostility between the decedent's two oldest children and Mrs. Field. They had vigorously opposed the marriage.

Initially, Mr. Chapman proposed a $2 million settlement based on a 50–50 evaluation of his client's chances to prevail. During the course of the litigation in *Field v. Farley,* both sides made offers and counteroffers. Finally, on January 29, 1969, there

was a meeting of the minds between Chapman and the executors' attorneys. They agreed on a $500,000 payment in settlement of all issues. Despite the recommendations of the attorneys for the executors, initially the settlement was opposed by the decedent's two oldest children, Marshall Field V and Joanne Field Langdon, who had reached their majority. Finally, after the attorneys for the executors outlined all of the advantages of such a settlement to the estate, the trusts and the beneficiaries, Marshall V acquiesced. Then, after the trustees of the residuary trusts agreed to distribute $175,000 to Joanne from the trust for her benefit, Joanne agreed.

On October 22, 1969, the executors petitioned the Chancery Court for approval of the settlement, stating that the settlement was in the best interests of the estate and beneficiaries because (a) so long as the proceeding was not finally disposed of, the risk that plaintiff might prevail made it impossible to conclude the administration of the estate; (b) the cost to the residuary trusts of carrying the proceeding to a final judicial conclusion might, even if plaintiff did not prevail, exceed the cost of the settlement; and (c) until the plaintiff's renunciative share was finally determined, it was impossible for the trustees to go forward with the orderly administration and investment of the residuary trusts funds. They informed the court that if the $500,000 settlement resulted in a marital deduction in that amount and a tax refund the net cost of the settlement would be only $180,000, whereas, if the widow were ultimately to prevail and receive a total of $3.9 million, the net cost after the marital deduction would be $960,000. Thus, the settlement could involve less than 19 percent of the amount at stake.

On October 22, 1969, the Chancery Court approved the settlement, stating in its decree that the amount to be paid under the settlement agreement was reasonable in view of the risks involved in an appeal, the costs and added fees which would result from such an appeal whether or not the plaintiff should be successful, and the delay

and loss to the estate entailed in the failure of the executors and trustees to go forward in the orderly distribution, administration and investment of the residuary trusts funds.

Although the Internal Revenue Code provides that the beneficiary of a life insurance policy includable in the gross estate and a person receiving property subject to a taxable power of appointment (neither of which may pass through the executor's hands) shall bear his proportionate part of the estate tax (I.R.C. §§ 2206, 2207), the Code does not otherwise prescribe how the burden of the estate tax shall be distributed. The Supreme Court has held that Congress intended that the estate tax should be paid out of the estate as a whole, but "the applicable state law as to the devolution of property at death should govern the distribution of the remainder and the ultimate impact of the federal tax." *Riggs v. Del Drago*, 317 U.S. 95, 97–98, 63 S.Ct. 109, 110, 87 L.Ed. 106 (1942).

Section 2056(a) of the Internal Revenue Code allows a deduction from the value of the gross estate for an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse subject to certain exceptions and limitations set forth in the adjoining subsections (b), (c) and (d). Section 2056(e) provides that for purposes of section 2056 an interest in property shall be considered as passing from the decedent to any person if and only if it passes in one of seven enumerated ways. The first of these is an interest which is bequeathed or devised to such person by the decedent. The second is an interest which is inherited by such person from the decedent. The third is an interest which is "the dower or curtesy interest (or statutory interest in lieu thereof) of such person as surviving spouse of the decedent." It is this latter provision which is at issue herein. Was the $500,000 a payment of the statutory interest in lieu of dower of Mrs. Field as surviving spouse of the decedent?

Defendant correctly points out that the issue is not what the widow has actually received from the estate, but what she was unconditionally entitled to receive on the date of decedent's death pursuant to Illinois statute, irrespective of private arrangement or probate court order. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 470–71, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *Jackson v. United States*, 376 U.S. 503, 84 S.Ct. 869, 11 L.Ed.2d 871 (1964); *Greene v. United States*, 476 F.2d 116 (7th Cir. 1973); *Cox v. United States*, 421 F.2d 576 (5th Cir. 1970); *Estate of Ahlstrom v. Commissioner*, 52 T.C. 220 (1969). Defendant then urges that the estate is not entitled to a marital deduction for what it paid the widow because she had no legal interest in such sum under Illinois law at date of death.

Plaintiffs' principal argument is that, irrespective of the ultimate determination of the law of Illinois, the $500,000 payment to the widow in satisfaction of her claim to a statutory interest in her husband's estate qualifies for the marital deduction because it was a settlement payment following a bona fide dispute and arm's-length negotiations. This argument is based on the authority of *Lyeth v. Hoey*, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938) and *Helvering v. Safe Deposit Co.*, 316 U.S. 56, 62 S.Ct. 925, 86 L.Ed. 1266 (1942).

In *Lyeth,* the question was whether property received in a compromise settlement of a will contest had come to the taxpayer as taxable income or was exempt from income tax as an inheritance. The taxpayer, an heir of the decedent, had contested the validity of decedent's will in which no provision had been made for him. The heir and the devisees and legatees under the will entered into a compromise providing that the will be probated and that a specific sum be paid to the taxpayer as heir. The Supreme Court held that for purposes of his federal income tax liability the money the heir received pursuant to the compromise should be treated as if acquired "by inheritance", for the reason that it was possible for him to receive it only "because of his standing as an heir and of his claim in that capacity." (305 U.S. at 196, 59 S.Ct. at 159.) Since if in an action brought by the taxpay-

er as an heir the contest had been fought to a finish and the plaintiff had recovered a judgment the property which he would have received would have been exempt under the tax law, the Court said, "the distinction sought to be made between acquisition through such a judgment and acquisition by a compromise agreement in lieu of such a judgment is too formal to be sound." (*Id.*)

In *Helvering v. Safe Deposit Co., supra,* the Court applied the *Lyeth* rationale in an estate tax case. There the question was whether or not the decedent had exercised general testamentary powers of appointment over trust properties of which he was the life beneficiary. Under the tax law then in effect, only if he had exercised such powers were the trust properties taxable to his estate. If he had not exercised them, the properties would go in default of appointment to decedent's descendents who were remaindermen of the trusts. Decedent's brother and sisters claimed that decedent had exercised the powers of appointment in their favor by will, but decedent's two children contested and denied the validity of the will. Eventually, the several claimants agreed to a compromise under which 37½ percent of the trust properties went to the brother and sisters, and a state court judgment confirmed the compromise. This time the Government contended that under the *Lyeth v. Hoey* doctrine effect should be given to the compromise so that the amount received thereunder constituted property passing by virtue of the exercise of a general power of appointment. The Supreme Court upheld the Government's position, reiterating what it had said in *Lyeth* as to the effect of the compromise agreement.

Plaintiffs also rely upon *Howard v. Commissioner,* 447 F.2d 152 (5th Cir. 1971), an income tax case which followed and expanded upon the theory of *Lyeth.* There the taxpayer's former husband, who had obtained a divorce of dubious validity, paid her $40,000 to release her dower rights in certain real property he owned so that he could convey a clear title to the purchaser in a profitable transaction. The Tax Court held the $40,000 was income to her, because,

as a matter of state law, she had no dower rights to release. In reversing the Tax Court the court explained the theory of *Lyeth* as follows (at 156):

> The question that determines whether the proceeds received by Lucille are to be treated for tax purposes as property received for release of dower rights is not whether in fact Florida would recognize dower rights in Lucille but rather whether there was a good faith compromise concerning her claim to dower rights.
>
> \* \* \* \* \* \*
>
> \* \* \* [T]he proper standard for judging the bona fides of a compromise for tax purposes is not whether the court might decide that the claim is meritorious but whether the taxpayer in good faith thinks that the claim is meritorious.

And (at 158):

> There are strong policy reasons for taking at face value compromises based on claims made in good faith \* \* \*.
>
> Such considerations have a proper bearing on the tax treatment of proceeds received under compromises. Two factors stand out. First, compromises may reach just results even though a party would not win in court. And second, reliance on good faith avoids the necessity for federal courts to determine sometimes-complex issues of state law, where on occasion they may err in determining what a state court would do.

In considering the applicability of the *Lyeth* and *Safe Deposit Co.* principles to the compromise of claims of surviving spouses to dower and statutory rights in lieu of dower as a basis for the marital deduction, it is interesting to take note of the Supreme Court's response in the *Safe Deposit Co.* case to the taxpayer's argument that the *Lyeth* case principle should not be controlling where the question is one of estate tax liability. The taxpayer urged that it is reasonable for an income tax to be determined by a compromise preceding the receipt of income but that a compromise occurring after decedent's death, which is the taxable event under an estate tax, should

not be effective to change the impact of the estate tax. The Court merely replied that in *Helvering v. Grinnell*, 294 U.S. 153, 55 S.Ct. 354, 79 L.Ed. 825 (1935), it had already been clearly recognized that an event subsequent to the decedent's death, an event controlled by his beneficiaries, can determine the inclusion or not of certain assets within the decedent's gross estate. In *Grinnell* the donee of a general power of appointment received under her father's will in 1876 exercised the power by her own will in 1927 in favor of her sisters, who under the father's will would have been entitled to the property in default of appointment in any event. The Court held that the sisters' subsequent renunciation of the appointment in their favor was effective to prevent the property from passing under the donee's exercise of the power and hence it was not taxable to the donee's estate.

Since in 1942 Congress in effect repudiated *Helvering v. Grinnell*,[2] to the extent that the Supreme Court's decision in *Safe Deposit Co.* permitting a post-death compromise of the claim of an heir to an estate to determine the taxable estate rests upon *Grinnell*, a question arises as to whether or not Congress intended the principle of the *Safe Deposit Co.* case to be applicable to cases involving the subsequently enacted marital deduction.[3] In this regard, two more recent Supreme Court cases are pertinent: *Jackson v. United States, supra,* and *Commissioner v. Estate of Bosch, supra.*

The allowance of the marital deduction for an amount equal to the value of any interest in property which passes from the decedent to his surviving spouse is subject to the restriction that a "terminable" inter-

est does not qualify as an interest in property to which the marital deduction applies. An interest is terminable, "where, on the lapse of time, on the occurrence of an event or contingency, or upon the failure of an event or contingency to occur, an interest passing to the surviving spouse will terminate or fail." (I.R.C. § 2056(b).) The question raised by the *Jackson* case was whether or not the allowance provided by California law for the support of the widow during the settlement of her husband's estate was a terminable interest. It was in the sum of $3,000 per month payable from the corpus of the estate and was for a period of 24 months from his death. It was conceded that the right to the widow's allowance was an interest in property passing from the decedent. The Supreme Court ruled that in considering terminability of an interest for purposes of a marital deduction the interest was to be judged as of the date of the testator's death rather than at a later time when the condition imposed might be satisfied. The Court then held that the right to the widow's allowance under California law was a terminable interest because nothing accrued before the post-death order of the probate court granting it. If the widow died or remarried prior to securing an order for the allowance, the right did not survive such death or remarriage. Hence, even though the widow did in fact receive the entire $72,000, it was not deductible by the estate, because as of the date of decedent's death it was a terminable interest.[4]

In the decision entitled *Commissioner v. Estate of Bosch, supra,* the Supreme Court considered two separate cases arising from the Second Circuit, *Commissioner v. Estate*

---

**2.** Section 403 of the Revenue Act of 1942, ch. 619, 56 Stat. 798, amended section 811(f) of the Internal Revenue Code of 1939 to tax property with respect to which the decedent has at his death a general power of appointment, whether or not exercised. Although the Powers of Appointment Act of 1951, ch. 165, 65 Stat. 91, amended section 811(f) to grant partial relief from the 1942 Act to powers created prior to October 21, 1942, even with respect to these Congress eliminated the pre-1942 requirement that the property "pass" under the exercise of the power. *See* C. Lowndes and R. Kramer, Federal Estate and Gift Taxes, 257–61 (2d ed.

1962); Eisenstein, *Powers of Appointment and Estate Taxes*: II, 52 Yale L.J. 494, 496 (1943); and Craven, *Powers of Appointment Act of 1951,* 65 Harv.L.Rev. 55, 58, 65 (1951). And *see also* I.R.C. of 1954 § 2041.

**3.** The marital deduction was first enacted in the Revenue Act of 1948, ch. 168, 62 Stat. 110 § 361, amending § 812 of the Internal Revenue Code of 1939.

**4.** *See also Hearst v. United States,* 167 Ct.Cl. 513 (1964).

of Bosch, 363 F.2d 1009 (1966) and Second National Bank of New Haven v. United States, 351 F.2d 489 (1965). At issue in both was the question of the effect to be given under the federal marital deduction statute to a state trial court determination conclusive between the parties as to the nature and extent of the property interest passing from the decedent to his surviving spouse.

In the first case (Estate of Bosch), the decedent's estate potentially qualified for a marital deduction with respect to the value of property decedent had transferred in 1930 to a revocable trust for the benefit of his wife for life as long as he also transferred to her a general power of appointment in existence at his death in 1957. (I.R.C. § 2056(b)(5).) Unfortunately, in 1951, in order to take advantage of a newly enacted relief provision [5] which would exclude the property from her own estate, the wife purported to release the general power and convert it into a special power. After the husband's death in 1957, his executors filed an estate tax return claiming the marital deduction on the theory that the release of the general power was a nullity. This was challenged by the Commissioner of Internal Revenue. During the course of the ensuing Tax Court litigation, that court, with the Commissioner's assent, temporarily suspended its proceedings in order to allow the executor to petition the New York Supreme Court (a trial court) to determine the validity of the release. The state court, with the concurrence of the trustee, the widow, and the guardian ad litem of an infant who was a possible beneficiary, found the release to be a nullity. (The Commissioner chose not to appear.) The Tax Court thereupon accepted the state court's decision as an authoritative exposition of the requirements of state law, and on appeal the Court of Appeals for the Second Circuit likewise concluded that since the New York judgment authoritatively settled the rights of the parties between themselves, it also settled the state law "for purposes of the application to those rights of the relevant provisions of federal tax law." (387 U.S. at 459, 87 S.Ct. at 1780.)

In the second case (Second National Bank of New Haven ), the issue resembles the one herein. Decedent's will bequeathed one-third of the residue of his estate to his wife, and his executor claimed that for purposes of the marital deduction the one-third was to be computed on the principal before deducting an allowance for estate taxes. A Connecticut statute provided generally that federal estate tax paid, "except when a testator otherwise directs in his will", shall "be equitably apportioned among the persons interested in the estate." [6] If applicable, this meant that the widow, whose share was not subject to federal estate tax, would bear no part of the burden of the tax. However, decedent's will directed that the "provisions of any statute requiring the apportionment or proration of such taxes among the beneficiaries of this will * * shall be without effect in the settlement of my estate." (387 U.S. at 460, 87 S.Ct. at 1780.) Nonetheless, in the estate tax return the executor claimed the larger marital deduction on the theory that the proration statute was applicable. After receipt of a letter of proposed deficiency from the District Director of Internal Revenue, the executor initiated a proceeding in the state probate court for a determination that the state apportionment statute was applicable and gave notice to all parties having an adverse interest, including other beneficiaries of the will, and the District Director. The District Director, as a matter of IRS general policy, chose not to appear, and none of the others served objected to the executor's position. The probate court then found that the decedent's will did not negate the application of the state apportionment statute and ordered that the entire federal tax be prorated and charged solely against trusts for other residuary legatees (grandchildren) and none against the wid-

---

5. Internal Revenue Code of 1939 § 811(f), as amended by the Powers of Appointment Act of 1951, ch. 165, 65 Stat. 91.

6. General Statutes of Connecticut, ch. 218, § 12–401 (1958).

ow. A different panel of the Second Circuit held that the judgment of the state probate court was not binding on the federal court, that the decedent's will had clearly and validly provided against application of the proration statute, and, therefore, irrespective of the effect of the probate court's decree on the rights of the parties among themselves, the marital deduction would be limited to one-third of the residual estate *after* allowance for federal taxes.

A majority of the Supreme Court declined to accept either the taxpayers' position that the effect to be given to the state trial courts' decision should depend upon whether or not its determination was binding upon the parties, or the Government's position that it should depend upon whether or not the litigation from which the judgment resulted bears the indicia of a genuinely adverse proceeding. The Court found that Congress "intended the marital deduction to be strictly construed and applied." (387 U.S. at 464, 87 S.Ct. at 1782.) It stated that the marital deduction "turns upon the character of a property interest held and transferred by the decedent under state law." (387 U.S. at 457, 87 S.Ct. at 1779.) Therefore, in ruling on the deduction, it held, it is the duty of the federal court to find the pertinent state law itself. In ascertaining that state law, the federal court should look to the decisions of the highest court of the state. In the absence of a decision by the highest court, the decision of an intermediate appellate state court is not to be disregarded by the federal court unless convinced that the highest court of the state would decide otherwise. In the absence of an intermediate court ruling, the federal court must apply what it finds to be the state law after giving proper regard to relevant rulings of other state courts. "In this respect, it may be said to be, in effect, sitting as a state court." (387 U.S. at 465, 87 S.Ct. at 1783.) In any event, in ascertaining "the character of a property interest held and transferred by the decedent under state law, federal authorities are not bound by the determination made of such property interest by a state trial court." (387 U.S. at 457, 87 S.Ct. at 1779.)

In sum, *Jackson* holds that for purposes of the marital deduction it is not controlling that the widow has rights to property and that she in fact receives the property; if she does not have these rights at the time of her husband's death, it is a nondeductible terminable interest. While *Estate of Bosch* holds that neither what the state trial court rules the widow's rights against the estate and other beneficiaries to be, nor what the widow in fact receives, is controlling; to the extent the marital deduction depends upon the rights of a surviving spouse under state law, the federal court must find its state law from the decisions of the highest court of the state, or in their absence sit as a state court to determine such law from the best available sources.

Under these circumstances, a compromise between the surviving spouse and the representatives of the estate and other beneficiaries, whether or not ratified by a state trial court, may be effective to determine the rights of such parties between themselves and the amount receivable by the surviving spouse; but the compromise no more determines the question of state law between the Commissioner of Internal Revenue and the taxpayer than does the decision of the state trial court. The amount received by the widow pursuant to the compromise qualifies for the marital deduction only if the state law is found by the federal court to support the right to the payment. Good faith is beside the point—the parties may have been mistaken as to the state law just as each state trial court was in *Estate of Bosch.*

The conclusion that the *Lyeth* line of cases is inapplicable to settlement of state law questions underlying claims for marital deductions is also supported by evidence of legislative intent and Treasury Regulations originally promulgated substantially contemporaneously with the enactment of the marital deduction sections. The Senate Committee Report on the marital deduction states (S.Rep. No. 1013 (Pt. 2) 80th Cong., 2d Sess. 5 (1948–1 C.B. 285, 334)): "[A]ny interest received by the surviving spouse under a settlement which does not reflect

her rights under the local law does not pass to the surviving spouse from the decedent." Treasury Regulations § 2056(e)–2(d) (1954) states with respect to settlements of will contests—

(2) If as a result of the controversy involving the decedent's will, or involving any bequest or devise thereunder, a property interest is assigned or surrendered to the surviving spouse, *the interest so acquired will be regarded as having "passed from the decedent to his surviving spouse" only if the assignment of surrender is a bona fide recognition of enforceable rights of the surviving spouse in the decedent's estate.* [Emphasis supplied.]

This provision was originally promulgated in 1948.[7] The Supreme Court has stated that such regulations are entitled to serious consideration as "substantially contemporaneous expressions of opinion [which] are highly relevant and material evidence of the probable general understanding of the times and of the opinions of men who probably were active in the drafting of the statute." *White v. Winchester Club,* 315 U.S. 32, 41, 62 S.Ct. 425, 430, 86 L.Ed. 619 (1942). The fact that the same provisions have survived without change through re-enactment and amendments of the estate tax laws over almost 30 years is additional evidence of congressional approval of the Treasury's interpretation of the law. *Fribourg Navigation Co. v. Commissioner,* 383 U.S. 272, 283, 86 S.Ct. 862, 15 L.Ed.2d 751 (1966); *Helvering v. Winmill,* 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52 (1938).

Although the quoted language of the regulations deals with settlement of will contests, defendant asserts and plaintiffs do not dispute that it is equally applicable to settlements of controversies involving marital deductions based on statutory interests in lieu of dower. And *see also Citizens & Southern National Bank v. United States,* 451 F.2d 221, 226 (5th Cir. 1971); Rev.Rul. 66–139 (1966–1 C.B. 225).

In *Estate of Nachimson v. Commissioner,* 50 T.C. 452 (1968), the Tax Court considered the compatibility of the settlement of state law issues as an independent basis for allowance of the marital deduction with the underlying theory of *Estate of Bosch.* There, the decedent's widow, dissatisfied with the provision for her in her husband's will, made demand upon the executors of his estate to have her dower assigned. Decedent's real estate subject to dower consisted of two parcels with an aggregate value of $26,750, both of which were incapable of being partitioned. As a result of arm's-length bargaining between representatives of the widow and of the estate, the parties entered into an agreement pursuant to which the widow received a lump-sum payment of $10,000 in consideration of her release of all her claims against the estate, and the settlement agreement and release were filed in the New Jersey Surrogate Court. When the estate thereafter sought to deduct the $10,000 as a "statutory interest in lieu [of dower]" within the meaning of section 2056(e)(3) of the Code and therefore qualifying as passing to the widow from the decedent, the court ruled first (at 454):

At the outset it should be recognized that the mere fact that the lump-sum payment herein was made pursuant to an arm's-length agreement is not determinative. Admittedly, such agreements, settling disputes of the type involved herein, have been favored by the courts, as indeed they should.[2] *Dougherty v. United States,* 292 F.2d 331 (C.A. 6, 1961); *Stephens v. United States,* 270 F.Supp. 968 (D.Mont.1967); *Moore v. United States,* 214 F.Supp. 603 (W.D.Ky.1963); *cf. Lyeth v. Hoey,* 305 U.S. 188 [59 S.Ct. 155, 83 L.Ed. 119 (1938); *Estate of Gertrude P. Barrett,* 22 T.C. 606 (1954). But the foundation of these decisions is that the arm's-length agreement simply reflects a monetary disposition by the parties of the underlying legal right of the taxpayer. They in no way suggest that the agree-

---

7. The provision first appears in Treas. Reg. 105 § 81.47a(g) (1939), added by T.D. 5699 (1949–1 C.B. 181, 202).

ment determines *the source or nature of those rights.* [Emphasis the court's.]

> 2 It may be that the recent decision of the Supreme Court in *Commissioner v. Estate of Bosch,* 387 U.S. 456 [87 S.Ct. 1776, 18 L.Ed.2d 886] (1967), will require the Federal courts to look behind an arm's-length settlement in order to determine the effect which should be given it for tax purposes. * * *

The court then found that under New Jersey law the only *statutory* authority for the courts to award a lump sum in lieu of dower was in the situation where dower cannot be admeasured without prejudice to the owners and the property must therefore be sold under judicial procedure. Therefore, it held (at 456):

> [W]e can only conclude that the source of the right of the widow to receive the $10,000 was the agreement with the estate and not the provisions of the New Jersey statutes. Accordingly, such right did not reflect a *"statutory* interest in lieu [of dower]." Since the $10,000 was obviously neither dower itself nor otherwise derived from the decedent, it did not represent an interest which "passed" within the meaning of section 2056(a) or (e). [Emphasis the court's.] [8]

Although the Tax Court found it unnecessary to rule on the issue, it noted in passing that after *Jackson v. United States, supra,* there was also the question as to whether a widow's payment derived from a post-death settlement agreement rather than through an interest required by a state state, was not likewise disqualified as a terminable interest under section 2056(b).

Plaintiffs cite as a post-*Estate of Bosch* marital deduction case involving a compromise *Bel v. United States,* 452 F.2d 683 (5th Cir. 1971), *cert. denied,* 406 U.S. 919, 92 S.Ct. 1770, 32 L.Ed.2d 118, *on remand,* 73–1

USTC 81,305 (W.D.La.1972). In *Bel,* the estate claimed a marital deduction for half of decedent's separate property bequeathed to his wife in diminution of the Louisiana law forced heirship rights of his children to two-thirds. In response to the estate's claim that there had been a compromise between the estate and the children, the court remanded to the district court to determine whether or not there was an arm's-length compromise of a genuine controversy and if so, whether there "was a bona fide recognition of enforceable rights of the surviving spouse in the decedent's estate" in the language of the regulation (452 F.2d at 694). It did not decide that a compromise could control in the absence of enforceable rights under state law. On remand the district court found the settlement was bona fide because the widow gave up her contentions that some of the property listed as decedent's separate property was really community property and as to the relative value of each—obviously factual questions. There was no mention of *Estate of Bosch* in either court, and the decision of the district court appears at least in part inconsistent with *United States v. Stapf,* 375 U.S. 118, 84 S.Ct. 248, 11 L.Ed.2d 195 (1963).

Defendant urges that the $500,000 settlement with the widow was not a "bona fide recognition of enforceable rights of the surviving spouse in the decedent's estate" within the meaning of Treasury Regulations § 2056(e)–2(d), both because objectively state law is to the contrary and because subjectively the settlement was motivated by considerations other than recognition of the widow's rights under Illinois law.

There being no Illinois Supreme Court decision on the substantive issue of whether the widow was entitled to one-third of the

**8.** In a leading article on the *Bosch* case (*Sobeloff, Tax Effect of State Court Decisions—The Impact of Bosch,* 21 ABA Tax Lawyer, 507, 526 (1968)), it is likewise stated:

> The *Helvering v. Safe Deposit & Trust Co.* principle that settlements of bona fide claims may be given effect in determining federal estate tax liability seems to be changed by *Bosch.* Obviously the marital deduction issues in *Bosch* and *Second National Bank* would have been decided the same way by

the Supreme Court if the state litigation therein had been the basis of settlement rather than decision. Moreover, if there had been an arms-length settlement of a bona fide claim, rather than a claim "brought for the purpose of directly affecting federal estate tax liability" as the Supreme Court said, in passing, of those cases, the reasoning expressed in large portions of the *Bosch* opinion probably would remain applicable. [Footnote omitted.]

estate before or after payment of federal estate taxes, defendant relies upon the decision of the intermediate appellate court in *Northern Trust Co. v. Wilson,* 344 Ill.App. 508, 101 N.E.2d 604 (1951), *leave to appeal denied,* 410 Ill. 630 (1952). There the court held that a widow who renounced the provisions of her husband's will and claimed her one-third statutory share of his estate was only entitled to have her one-third computed after deduction of the federal estate tax despite the fact that because of the marital deduction her portion was not taxed.

In *Commissioner v. Estate of Bosch, supra,* 387 U.S. at 465, 87 S.Ct. at 1782, the Supreme Court stated (quoting from *West v. A. T. & T. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940)) that where the highest court of a state has not spoken on a point—"an intermediate appellate state court * * * is a datum for ascertaining state law which is not to be disregarded by a federal court *unless it is convinced by other persuasive data that the highest court of the State would decide otherwise.*" [Emphasis supplied by the Supreme Court in *Estate of Bosch.*]

The decision in *Roe v. Estate of Farrell,* 69 Ill.2d 525, 14 Ill.Dec. 466, 372 N.E.2d 662 (1978), is a datum which is persuasive that if faced with the issue in *Northern Trust Co. v. Wilson, supra,* the highest court of that state would decide otherwise. There the decedent died intestate in 1973 owning property subject to probate worth $13,848, but in addition she possessed property in joint tenancy which, although not includable in her probate estate, was subject to federal estate tax and was valued in the tax return at $100,528. The tax on the combined properties was $5,340, although but for the inclusion of the joint tenancy property in the taxable estate there would have been no federal estate tax. Since under federal law (I.R.C. §§ 2002, 2203) the administratrix was liable for the entire tax, she petitioned the circuit court to have the surviving joint tenant contribute to its payment. The circuit court equitably apportioned the tax burden by ordering the joint tenant to contribute the same proportion of the tax as the value of the joint tenancy

property in the tax return bore to the total gross estate in such return. An intermediate appellate court reversed on the grounds that the estate tax was one of the claims which under the Illinois probate law the estate was required to pay out of probate assets, that there was no authority under Illinois law for subjecting the property in joint tenancy to claims against the estate, and that equitable apportionment, if deemed desirable, should be legislatively mandated and not judicially improvised. (42 Ill.App.3d 705, 1 Ill.Dec. 218, 356 N.E.2d 344 (1976).)

The Illinois Supreme Court reversed the appellate court. In its opinion it stated (14 Ill.Dec. at 469, 372 N.E.2d at 665–66):

We judge the circuit court correctly ordered an equitable apportionment of the estate tax between the surviving joint tenants and the intestate estate. The nonprobate assets here generated the estate tax liability in large part, and to deny apportionment would inequitably favor the recipients of the nonprobate assets. The circuit court under the circumstances could properly invoke the holding in *In re Estate of Van Duser,* 19 Ill.App.3d 1022, 1024, 313 N.E.2d 228, 229 (1974), where it was said under closely resembling circumstances: "[L]ogic, reason, and simple justice dictate that, unless there is a contrary intention expressed by the decedent, as in a will in testate estates, the doctrine of equitable contribution should be invoked as to nonprobate assets to fairly distribute the Federal estate tax burden."

There has been, it would appear, reliance upon the holding in *Van Duser* in the profession. * * * We consider that this reliance has not been misplaced, and that the *Van Duser* court was correct in making an equitable apportionment.

J. Pomeroy's Equity Jurisprudence (5th ed. 1941) in volume 2, section 411, at pages 157–58, describes the doctrine of equitable contribution which should be applied here:

"Finally, the most important doctrine, perhaps, which results from the principle, Equality is equity, is that of contribution among joint debtors, co-sureties, co-contractors, and all others upon whom the same pecuniary obligation arising from contract, express or implied, rests. This doctrine is evidently based upon the notion that the burden in all such cases should be equally borne by all the persons upon whom it is imposed, and its necessary effect is to equalize that burden whenever one of the parties has, in pursuance of his mere legal liability, paid or been compelled to pay the whole amount, or any amount greater than his proportionate share. No more *just* doctrine is found in the entire range of equity; and although it is now a familiar rule of the law, it should not be forgotten that its conception and origin are wholly due to the creative functions of the chancellor."

The court also ruled that the equitable considerations which supported the apportionment of the estate tax logically extended to and were applicable to support the proration of attorneys' fees and expenses incurred on behalf of the probate and nonprobate assets.

Although *Roe v. Farrell, supra,* does not deal with the precise problem here, namely, whether the estate tax should be equitably apportioned so as to relieve the widow's untaxed statutory share from having to bear part of the burden of the tax imposed upon the remainder of the estate, it is apparent that it removes the logical underpinnings for the opinion in *Northern Trust Co. v. Wilson,* supra, in that—

1. Wilson relied upon the fact that the statute under which the widow claimed her renunciative share, section 16 of the Probate Act (Ill.Ann.Stat. ch. 3 (Smith-Hurd 1961)), provided that she was entitled to such share "after payment of all just claims" and that section 202 of the Probate Act which classified claims against the decedent's estate, specifically included "debts due the United States" as claims of the third class. However, in *Farrell*, the court ruled that neither section 207 of the Act, analogously charging the probate assets with the federal estate tax liability, nor section 202, bars the exercise of the court's equitable powers to apportion the estate tax against the nonprobate assets. It stated (14 Ill.Dec. at 469, 372 N.E.2d at 665):

We do not consider that either section manifests a legislative intent that the "ultimate impact" (*Riggs v. Del Drago* (1942), 317 U.S. 95, 98, 63 S.Ct. 109, 87 L.Ed. 106 * * *) of the Federal estate tax burden must invariably fall upon the probate assets. * * *

Section [202] classifies claims which may be presented against a decedent's estate. The third class of claims in the paragraph is "Debts due the United States." But this classifying of claims and the designation of priorities for their payment is completely unrelated to the question of whether the burden of the Federal estate tax should be apportioned. The classifications in section [202], including the third class, were established prior to the Supreme Court's holding in *Riggs v. Del Drago* * * *. One simply cannot read into section [202] a legislative intent to preclude the requiring of contribution from surviving joint tenants for their proportionate share of the estate tax.

2. *Wilson* adopted the view that, since Illinois has no statute authorizing the apportionment of federal estate tax among beneficiaries of an estate, decisions from other jurisdictions applying equitable apportionment cannot provide support for it in Illinois. However, in *Farrell*, as already noted, the court found equitable apportionment to be a general equitable rule to be applied by courts where not specifically precluded by statute.

3. In *Wilson*, the court relied on four decisions of the Illinois Supreme Court as requiring the rejection of equitable apportionment under Illinois law: *People v. Pasfield*, 284 Ill. 450, 120 N.E. 286 (1918); *People v. Northern Trust Co.*, 289 Ill. 475, 124 N.E. 662 (1919); *People v. McCormick*, 327

Ill. 547, 561, 158 N.E. 861, 867 (1927); and *First National Bank of Chicago v. Hart*, 383 Ill. 489, 497, 50 N.E.2d 461, 464 (1943). However, in *Farrell*, the court stated (14 Ill.Dec. at 468, 372 N.E.2d at 665):

> It would appear that most of those States that have considered the question have allowed some type of apportionment of the tax burden (See Annot., 68 A.L.R.3d 714 (1976).) There are opinions of this court containing *dicta* concerning the question (*e. g., People v. Pasfield*, 284 Ill. 450, 120 N.E. 286; *First National Bank v. Hart*, 383 Ill. 489, 50 N.E.2d 461), but the court has not heretofore directly addressed the question whether an apportionment of the estate tax burden may be allowed.

■ Although it seems reasonable to infer that, once the Supreme Court of Illinois has found that Illinois law permits or requires the equitable apportionment of the burden of federal estate taxes in accordance with the relative values of the property generating the taxes and the property that does not, it would apply that doctrine in favor of a widow to the extent her elective share of her husband's estate generates no tax because of the marital deduction, there has yet been no Illinois court decision balancing the widow's equities against those of the decedent's other heirs or beneficiaries.[9]

Cases in other states are in disarray. *See* Annot., Brunner, *Surviving Spouse Taking Elective Share as Chargeable with Estate or Inheritance Tax*, 67 A.L.R.3d 199, 209–29 (1975). Several courts which accept equitable apportionment between probate and nonprobate assets have nevertheless rejected the widow's contention that her elective share should be computed without regard to estate tax. *Estate of Mosby*, 554 P.2d 1341 (Mont.1975); *Old Colony Trust Co. v. McGowan*, 156 Me. 138, 163 A.2d 538 (1960); *Campbell v. Lloyd*, 162 Ohio St. 203, 122 N.E.2d 695 (1954), *cert. denied*, 349 U.S. 911, 75 S.Ct. 600, 99 L.Ed. 1246 (1955); and *see also In re Glover's Estate*, 45 Hawaii 569,

371 P.2d 361 (1962). Such courts have stated in support of their decisions that the federal estate tax is a tax on the transfer of the entire estate from the decedent rather than on particular bequests or distributive shares received by beneficiaries or heirs; that the marital deduction is not an exemption for the widow but a deduction belonging to the estate; that after taxes the untaxed widow's share would be disproportionately larger than those of other heirs; and that the matter is one of public policy best left to the legislature.

On the other hand, there have been many other court decisions supporting judicially imposed equitable apportionment of estate taxes in favor of the widow whose elective share qualifies for the marital deduction. While the matter is not wholly free from doubt, we believe the reasoning of the latter is the more persuasive and in the light of *Roe v. Farrell* is more likely of adoption by the Illinois Supreme Court. For the same reasons which persuaded the court that it was inequitable that the heirs of Ms. Farrell should bear the burden of the estate tax on the joint tenancy property because it generated the tax, so it is inequitable to require a widow whose property generated no tax to contribute to the payment of the tax generated by property received by others. *Compare Seymour National Bank v. Heideman*, 133 Ind.App. 104, 178 N.E.2d 771 (1961) and *Jones v. Jones*, 376 S.W.2d 210 (Mo.1964), applying equitable apportionment in favor of the widow under Indiana and Missouri law, respectively, in similar circumstances.

■ Protection of the interest of the widow against competing claims to her husband's estate has been a part of Illinois statutory and judicial policy since 1787. *In re Judd's Estate*, 292 Ill.App. 563, 11 N.E.2d 989 (1937); *Smith v. Northern Trust Co.*, 322 Ill.App. 168, 54 N.E.2d 75 (1944); *Blankenship v. Hall*, 233 Ill. 116, 129, 84 N.E. 192, 196 (1908). In *Cox v. United States*, 421 F.2d 576, 584 (5th Cir. 1970),

---

**9.** The *Wilson* case, *supra*, is not pertinent because it was decided on the erroneous theory that equitable apportionment of the burden of federal estate taxes was not authorized in Illinois at all.

construing Alabama law, the court pointed out that historically the common law has long favored dower because it was designed to support the widow out of her husband's estate, and that it is "unthinkable" that a state court "which protects specific bequests from reduction due to the estate tax would not also protect the more favored marital share of the widow."

■ In enacting the marital deduction, Congress intended to allow a portion of the property of a decedent to pass to his surviving spouse free of the burden of federal estate tax. (S.Rep. No. 1013 (Pt. 2) 80th Cong., 2d Sess. 2 (1948–1 C.B. 285, 332).) As the court stated in *Pitts v. Hamrick*, 228 F.2d 486, 490 (4th Cir. 1955) (applying South Carolina law)—

Where the estate is to receive the benefit of the deduction of the widow's share from the gross estate in order that that share may be relieved of the burden of the estate tax, as Congress intended, it would be unfair and unjust to require her share to bear any portion of that tax; * * *.

It is inconceivable here that any part of the estate tax should be attributed to the share of the widow, where the purpose of Congress in allowing the marital deduction was to free the interest of the surviving spouse from the burden of that tax and where the estate receives the benefit of the deduction because of that interest. [Footnote omitted.]

And *see also In re Rosenfeld's Estate*, 376 Pa. 42, 101 A.2d 684 (1954) with respect to Pennsylvania law.

■ Congress enacted the marital deduction for up to half of a decedent's estate as part of an overall program (including income-splitting for married couples) for "geographic equalization" of the income, estate and gift tax burdens of residents of common law and community property states. (S.Rep. No. 1013, 22–29 (1948–1 C.B. at 301–306); *United States v. Stapf*, 375 U.S. 118, 128, 84 S.Ct. 248, 11 L.Ed.2d 195 (1963).) The surviving spouse in a community property state is not required to reduce her share of the joint property by contributing to the burden of the estate taxes on the remainder, and the taxable estate is not thereby increased. Where there is no evidence of a contrary statutory policy, it is difficult to impute to the legislature or the highest court of a common law state the intent to deny its citizens the full benefit of such geographic equalization by reducing the surviving spouse's elective share through deduction of federal estate taxes and thereby increasing the tax on the estate beyond the amount to which it would be subject in a community property state. *Compare Dodd v. United States*, 345 F.2d 715, 718 (3d Cir. 1965) with respect to New Jersey law; *Lincoln Bank & Trust Co. v. Huber*, 240 S.W.2d 89 (Ky.1951) and *Estate of Whipple v. United States*, 419 F.2d 494, 496 (6th Cir. 1969), with respect to Kentucky law; and *Spurrier v. First National Bank of Wichita*, 207 Kan. 406, 485 P.2d 209 (1971); *Hammond v. Wheeler*, 347 S.W.2d 884 (Mo.1961); and *In re Rosenfeld's Estate, supra*. And *see also* Kahn, *The Federal Estate Tax Burden Borne by a Dissenting Widow*, 64 Mich.L.Rev. 1499 (1966).

■ Finally, if a surviving spouse whose property qualifies for the marital deduction is required to bear the burden of part of the tax generated by other property of the decedent, she may well be subjected to double taxation. The marital deduction is generally restricted to the transfer of property interests that will be includable in the surviving spouse's gross estate. This is because the purpose of the deduction "is only to permit a married couple's property to be taxed in two stages and not to allow a tax-exempt transfer of wealth into succeeding generations." *United States v. Stapf, supra*, 375 U.S. at 128, 84 S.Ct. at 255. If a surviving spouse takes her statutory share of the decedent's estate subject to the requirements that she pay both a portion of the tax on the decedent's estate and also on the property received from the decedent as a part of her own estate in the same generation, she will have received a share of her husband's estate which is effectively less

than the one-third which state law guarantees her.[10]

■ Having determined that Illinois law did entitle the widow to have her one-third share of the estate computed without reduction for estate tax, consideration is now given to defendant's argument that the $500,000 settlement did not represent a bona fide evaluation of the widow's chances of prevailing on her claim. Defendant contends it was paid for the following other reasons:

1. The executors intended $150,000 of the $500,000 as payment for the widow's attorneys' fees.

2. The executors avoided a potential $100,000 to $200,000 expense in additional attorneys' fees which they would likely have had to incur had they opposed the widow's claim in the appellate courts.

3. Because of the litigation with the widow, the estate was required to keep its assets liquid instead of paying them out to the residuary trusts for the decedent's children, which would have invested them in long-term securities. Settlement of the widow's claim thus avoided the further loss of investment and capital appreciation opportunities during the period in which the estate would be tied up.

4. The widow's litigation also posed a threat to the estate in that it might be unable to obtain probate court approval for the redemption of sufficient Field Enterprises, Inc. stock (a major asset of the estate, most of which was bequeathed to the trusts) to pay the estate taxes by August 1970, the deadline for obtaining favorable tax treatment for a redemption for such purposes, pursuant to section 303 of the Internal Revenue Code. The widow took the position that the $90-per-share redemp-

tion price was too low, and was designed to favor the trusts and thus unfairly reduced the value of her one-third share of the estate.

Defendant argues that these considerations were worth more than the $500,000 the executors paid out under the settlement and, therefore, they must have deemed the widow's claim to be worth only nuisance value.

Defendant concedes that the settlement was negotiated at arm's length and in good faith.

Defendant's arguments are not persuasive that the executors regarded the widow's marital deduction claim as worth only nuisance value. The direct evidence, both testimonial and documentary, is that in the opinions of the executors and the attorneys for the executors and heirs the widow's chances for success covered a wide range—from "very substantial" to "nuisance value", and that neither of the executors thought it was worth only nuisance value. It is fair to conclude the consensus was that the estate's chances of prevailing were better than those of the widow, but most of them did not regard the widow's claim as insubstantial. All in all, their evaluation seems fairly reflected in the amount of the settlement, which may reasonably be regarded as a payment of about 12½ percent of the amount at stake before taxes and about 19 percent after.

The fact that $150,000 of the $500,000 was regarded at one point in the negotiations as a sum necessary to pay the widow's legal expenses in the litigation has little bearing on the evaluation of her claim. The settlement agreement did not require her to use any particular portion of the fund for such purpose. Payment of her

---

10. I.R.C. § 2013(a) provides that the estate tax otherwise due shall be credited with all or a part of the amount of the estate tax paid with respect to the transfer of property to the decedent by a person who died within 10 years before the decedent's death. However section 2013(d) reduces the value of the property subject to the credit by the amount allowed as a marital deduction from the gross estate of the transferor.

The fact that in this particular case Mrs. Field was considerably younger than her husband does not appear pertinent in appraising the probable determination by the Illinois Supreme Court as to the law of equitable apportionment with respect to surviving spouses generally.

attorneys was her personal obligation, not a condition of the settlement. Had the case proceeded to judgment, any recovery the widow obtained would have been used as a source of payment for her attorneys' fees, and this would not have reduced her marital deduction. Thus, even if a portion of the $500,000 settlement was informally considered as necessary to cover her attorneys' fees it should not affect the deductibility of the $500,000. Nor does it make any difference that her attorneys also represented her in other aspects of her claim against the estate. Whatever the nature of the legal services, payment of the widow's obligation therefor was a payment for her benefit. Moreover, the evidence indicates that everything her attorneys did, including the evaluation of the estate's assets and the determination of the fair-market-value of the Field Enterprises, Inc. shares, was for the purpose of maximizing the widow's one-third share of the estate.

To the extent the executors were also motivated by the desire to avoid unnecessary costs of litigation, to prevent the estate having its assets tied up and losing opportunities for investment income and appreciation of assets, and to protect the estate from exposure to unnecessary adverse tax consequences, motivations of such kind almost always influence acceptance of offers in compromise. Attorneys for litigating parties would be derelict in their duties if they did not take them into account. What is important is that if the widow had received a judgment for everything she claimed, it would all have been deductible—and defendant does not dispute that. There is nothing in the record to support the notion that any portion of what the widow received was in settlement of anything but such claim. Furthermore, there is no evidence to indicate that she valued her chances of success in litigation at any less than what she agreed to accept or that the estate could have obtained a settlement from her at any less. If the plaintiffs had the burden of placing a monetary value on every element which induced their acceptance of the compromise, including avoidance of the potential detrimental financial consequences of litigation and the tax effect, and if such value had to be subtracted from the settlement figure for tax purposes, very few compromises could withstand attack from the Government. The regulations allowing a marital deduction for an amount paid in settlement of a widow's claim would have effect only in those rare situations where the Government's attorneys were not astute enough to probe the minds of the parties to the settlement as to the factors which they considered.

In *Howard v. Commissioner*, 447 F.2d 152 (5th Cir. 1971), in which a wife contended that a payment received from her husband was for release of her dower rights in certain real estate and the Government contended that it was income because she had no dower rights, the Government similarly sought to have the court disregard the parties' settlement on the ground that the husband had motivations for the payment other than an objective evaluation of his wife's claim. The court responded (at 157–59):

> Typically in cases involving compromises where the courts find the agreements made in good faith as a result of arm's length bargaining, this conclusion is based on various evidence of the seriousness of the dispute. Rarely does the court investigate the merits of the dispute to determine whether it is a close case or whether it is even arguable in fact.

> \* \* \* \* \* \*

Arguing further that the compromise recognized not a good faith claim but simply a "naked threat", the government asserts that the only reason that Nelson agreed to pay Lucille was that he was in financial distress and had no time to pursue any other course of action. That this may have been his motivation does not undercut the validity of the compromise. In response to a similar contention by the government in *Ridge Realization Corporation v. Commissioner*, 1966, 45 T.C. 508, the court said:

The theory that the nature of the amount received in a lawsuit settlement is governed by the nature of the claims asserted is not undermined by the fact that the Countess Bismarck may have been under the impression that the claims in the Marco action were without merit, and that she may have been impelled to initiate the settlement negotiations only by her desire to induce petitioner to release its claims. against her husband's estate and thus make his funds available to her. The facts that her need for the funds stimulated her to settle and that she is said to have believed the Marco action to be baseless no more alter the character of her payment to petitioner than other labels attached to settlement payments or the typical statements by defendants that they do not admit any liability whatever but are settling in order to rid themselves of nuisance claims.

Defendant relies upon *Estate of Menkus v. Commissioner*, 21 T.C.M. 559 (1962), a marital deduction case in which a settlement with a widow was disallowed as a basis for the deduction, as persuasive here that despite arm's-length negotiated payment to the surviving spouse, it should not be deductible because it was for reasons or purposes other than in settlement of her enforceable rights as a surviving spouse. However, the *Menkus* case is not at all comparable. There the total gross probate estate amounted to $4,000 and after expenses netted approximately $1,500, so that the most the widow could have received as an heir under New Jersey law was one-third of $1,500. Nevertheless, the decedent's two sons by a former marriage paid the widow $6,000 in settlement of her claim. Under these circumstances, and others in the record, the court found it obvious that the sons paid the excessive amount for personal reasons which would not qualify the estate for the marital deduction. Here the amount paid to the widow was a relatively small percentage of what she might have recovered in a judgment; her entire claim would have been receivable as her widow's elective share had she recovered judgment;

and, in view of the wide range of opinion as to the merits of her claim, the settlement percentage certainly came within the range of reasonableness.

It is concluded therefore that plaintiffs have overpaid their estate taxes and are entitled to a refund thereof.

## CONCLUSION OF LAW

The court has jurisdiction of the parties and of the claim. Plaintiffs are entitled to judgment for the recovery of overpaid taxes and interest in accordance with the findings and opinion. Determination of the amount thereof as reserved for further proceedings pursuant to Rule 131(c).